**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DANIEL J. NATALE**, | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   2:08-cv-476 |
| | )   **Electronic Filing** |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY,** | ) |
| Defendant. | ) |

<u>**MEMORANDUM OPINION**</u>

## I.   INTRODUCTION

Plaintiff Daniel J. Natale brought this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) for review of the final determination of the Commissioner of Social Security

("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act

("Act"), 42 U.S.C. §§ 401-433, 1381-1383f.  Presently before the court are cross-motions for

summary judgment based on the record developed at the administrative level.  After careful

consideration of the decision of the Administrative Law Judge ("ALJ"), the briefs of the parties,

and the entire record, it is clear that the substantial evidence as a whole demonstrates only that

Plaintiff is disabled within the meaning of the Act.  Accordingly, Plaintiff's motion will be

granted, Defendant's motion will be denied, and the matter will be remanded with direction to

grant benefits consistent with the recognition that Plaintiff was disabled on or before December

4, 2004.

## II.   PROCEDURAL HISTORY

Plaintiff protectively filed for DIB and SSI on March 12, 2004, alleging disability as of

February 15, 2004 due heart disease and depression.  (R.94-96, 126, 138, 428-32.)  The state

agency denied his claims on July 21, 2005. (R. 43-44, 427.)  At Plaintiff's request a hearing was

held before ALJ David Hatfield on May 17, 2005 where Plaintiff, who was represented by

counsel, and a vocational expert testified.  (R. 452-497.)  On September 7, 2005, the ALJ issued

a decision finding Plaintiff not disabled. (R. 48-55.)  On May 23, 2006, the Appeals Council

vacated the September 7, 2006 decision and remanded the case for further proceedings because the recording of the hearing was largely inaudible. (R. 6-8) The Appeals Council also ordered the ALJ to update the treatment evidence on claimant's condition, expressly evaluate the State Agency non-examining medical source opinions, and to further consider Plaintiff's residual functional capacity and set out his findings in a function by function analysis.(R. 81-82.)

A supplemental hearing was held on April 12, 2007, at which Plaintiff, who was represented by counsel, and a vocational expert testified. (R. 503-531.).  On June 6, 2007, ALJ Paul R. Sacks issued a decision finding Plaintiff not disabled. (R. 24-33). On December 30, 2007, Plaintiff filed an appeal to the Appeals Council, who denied Plaintiff's request for review on February 14, 2008. (R. 8-12.) The instant action followed.

## III.    STATEMENT OF THE CASE

Plaintiff was born on February 6, 1956, making him forty-eight years of age at the time of his asserted onset of disability and fifty-one years of age on the date of the ALJ's decision. (R 504.)  Plaintiff received his GED and completed a welding course. (R. 32, 509.)  Plaintiff's past relevant work includes serving as a food service and sales representative and as a maintenance man. (R. 510.)

On February 28, 2004, Plaintiff was admitted to the hospital complaining of chest pain and was seen by Dr. Elizabeth Piccone. (R. 212-213.)  Plaintiff's cardiac enzymes were negative and no changes were noted in his electrocardiogram ("EKG"), so he was discharged on February 29, 2004. Id. He was scheduled, however, for an outpatient stress test the following day. (R. 221.) Plaintiff suffered severe chest pain during the test and abnormal EKG response to exercise. Id. The test revealed myocardial ischemia in the left ventricular septal wall and a global ejection fraction of forty-three percent. (R. 221, 323.) Dr. Flores-Paras determined that Plaintiff was suffering from unstable angina, coronary artery disease, general anxiety disease, general anxiety disorder and hypertension. (R. 326.) A cardiac catheterization was ordered for Plaintiff for the same day. Id.

Plaintiff underwent a cardiac catheterization, which indicated three areas of blockage requiring a triple coronary artery bypass. (R.216-217, 334-335.) On March 4, 2004, Dr. George

Magovern performed bypass surgery on Plaintiff and placed him on Lopressor, Lipitor, Celexa, aspirin, and Wygesic. (R. 294). At a follow-up appointment with Dr. Piccone on April 7, 2004, Plaintiff reported normal post-surgical pain, but not other issues. (R. 293). A follow-up with Dr. Magovern yielded similar findings reflecting Plaintiff was doing well and had no complaints. (R.295).

On May 10, 2004, Plaintiff completed a disability report indicating that he was capable of cooking, doing laundry, and driving, but could not do yard work or gardening.(R. 154-164).  He also indicated he could vacuum and climb steps as long as he stopped to rest and could dress, shower, change and make the bed without resting. Id. With respect to his emotional symptoms, Plaintiff reported being irritable and depressed and having a difficult time making plans, a hard time getting up in the morning, and trouble focusing. Id. He also indicated that he did not like change but could make decisions on his own and experienced days when he was too nervous to go to work and sometimes had difficulty getting along with co-workers and supervisors. Id. With respect to his physical symptoms, Plaintiff reported experiencing a great deal of fatigue and daily chest and muscle pain and pain from bending, lifting, and getting up from the lying position. Id.

Plaintiff's Social Security adjudicator contacted his primary care physician, Dr. Abul-Ela, on June 28, 2004. (R.148.) Dr. Abul-Ela indicated that he had last seen Plaintiff of June 6, 2004 at which point Plaintiff had no chest pain complaints, but reported dyspnea on exertion. (R.286). Dr. Abul-Ela opined that Plaintiff was still very ill, which was partially compensated for with medications, and was only capable of a low level of activity. Id.  Dr. Abu-Ela also reported that Plaintiff was experiencing some depression due to his illness and inability to work and was switched from Celexa to Effexor and was doing much better on Effexor. Id.

On July 2, 2004, Dr. D.S. Kar, M.D. completed a Physical Functional Capacity Evaluation after a review of Plaintiff's records. (R. 262-270).  Dr. Kar opined that Plaintiff was capable of lifting ten pounds occasionally, less than ten pounds frequently, could stand/walk at least two hours in an eight-hour work day, sit for about six hours in an eight-hour work day, and was unlimited in his ability to push or pull. (R. 263).  He also indicated that Plaintiff had no postural, manipulative, environmental, or visual limitations. (R. 264-266).

Dr. Roger Glover, Ph.D., completed a Psychiatric Review Technique form on July 13, 2004. (R. 271).  After reviewing Plaintiff's records, Dr. Glover indicated that Plaintiff suffered from Depressive Disorder, NOS, but that the impairment was not severe. (R. 271, 274). Dr. Glover opined that Plaintiff had mild restrictions in the activities of daily living and in maintaining concentration, persistence, and pace; no difficulties in maintaining social functioning, and no episodes of decompensation.[1] (R.258-59).

On August 31, 2004, Plaintiff underwent a diagnostic assessment from a therapist for intake into People In Need at which time Plaintiff reported his medical history and history of drug and alcohol addiction. (R. 303). Upon mental examination, the therapist reported that Plaintiff's mental status was casual, clean, cooperative, engaged, friendly, unimpaired, mildly depressed, and anxious. (R. 305).  The therapist indicated that Plaintiff was a moderate risk to himself and had a Global Assessment of Functioning ("GAF") of 60.[2] Id. Plaintiff reported that he was experiencing depression, anxiety, guilt, and fear and agreed to undergo psychiatric evaluation and therapy. (R. 306).

On September 11, 2004, Plaintiff underwent a psychological assessment by Dr. Gaurav

---

[1] Decompensation is the worsening of a mental disorder due to a failure of defense mechanisms. 2 J.E. Schmidt, Attorney's Dictionary of Medicine Illustrated, D-26 (2008).

[2] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest.   A GAF score of between 31-40 denotes severe impairment.  The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).  An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation . . . .)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., . . . suicidal preoccupation)" or "inability to function in almost all areas . . .;" of 20 "[s]ome danger of hurting self or others . . . or occasionally fails to maintain minimal personal hygiene . . . or gross impairment in communication . . . ."  Id.

Gandotra, M.D., who later became Plaintiff's treating psychologist at People In Need. (R. 308-309).  Plaintiff reported that he had first been treated for depression in 1998 and had been sober since June 2004. (R. 308). Plaintiff also indicated that he was having difficulty sleeping, some mood swings, racing thoughts, anxiety, trouble focusing, was "being edgy," and was anhedonic and anergic. Id. Plaintiff admitted to suicidal thoughts through the previous two months, and agreed to pass any guns he had in his home on to his cousin. Id.  Plaintiff also reported some hypomania symptoms. Id. Upon mental examination, Dr. Gandotra noted that Plaintiff had a depressed mood and congruent affect.  (R. 309). Dr. Gandotra diagnosed Plaintiff with major depressive disorder, recurrent, severe without psychosis[3], rule out bipolar II, rule out adjustment disorder with depressed mood, rule out mood disorder, and rule out substance induced mood disorder. Id. Dr. Gandotra recommended putting Plaintiff on Lexapro and a sleep aid, Trazadone and advised a continuation of outpatient psychotherapy. Id.

On September 19, 2004, Dr. Piccone completed a form relating to Plaintiff's functional capacity on a scale developed by the American Heart Association. (R. 291).  She placed Plaintiff as a Class II patient indicating cardiac disease resulting in only slight limitations of physical activity. Id.   Dr. Piccone noted that Plaintiff was comfortable at rest, but ordinary physical activity could result in fatigue, palpitation, dyspnea, or anginal pain. Id. At a follow-up appointment on October 6, 2004, she reported that Plaintiff was "doing quite well from a cardiovascular standpoint" but was significantly depressed. (R. 310).  Plaintiff reported that he

_____

[3] Major depressive disorder is a condition marked by the occurrence of one or more major depressive episodes in the absence of manic or hypomanic episodes. Recurrent is defined by two or more depressive episodes separated by at least two months of a complete resolution of symptoms or the presence of symptoms that no longer meet the full criteria for a major depressive episodes. Major depressive disorder that is labeled as severe without psychotic features indicates several symptoms in excess of those required to make a diagnosis, and symptoms markedly interfere with occupational functioning or with usual social activities or relationships with others. Major depressive episodes are marked by a period of at least two consecutive weeks during which there is either depressed mood or the loss of interest or pleasure in nearly all activities. See American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 349, 369, 413(4th ed. 2000); 4 J.E. Schmidt, Attorney's Dictionary of Medicine Illustrated, M-18 (2008).

was not experiencing chest pain, pressure, dizziness or lightheadedness, or exertional shortness of breath. Dr. Piccone found no palpitations and the rest of the examination was normal. Id. Dr. Piccone stopped Plaintiff's Atenolol secondary to his depression. Id.

On December 4, 2004, Dr. Gandotra completed a form indicating that Plaintiff met the criteria for Listing 12.04 for Affective Disorders. (R.297-299.) Dr. Gandotra indicated that Plaintiff was experiencing disturbance of mood coupled with a full or partial manic or depressive syndrome as evidenced by his anhedonia, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating and thoughts of suicide. (R. 297). Dr. Gandotra opined that Plaintiff was suffering from extreme restrictions in the activities of daily living, marked restrictions in the maintaining of social functioning, marked deficiencies in concentration, persistence, or pace, and four or more episodes of decompensation. (R. 298). Dr. Gandotra further noted that there were repeated periods of decompensation present, each of extended duration, and that the residual disease process had resulted in such a marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause Plaintiff to decompensate. (R. 299).

On February 12, 2005, Plaintiff attended a follow-up appointment with Dr. Gandotra. (R.301-302).  Dr. Gandotra reported that Plaintiff's depression and anxiety were "better controlled" since his last visit, but also noted that Plaintiff was still experiencing depression stints lasting four days or more out of the blue when he would think about his financial situation. (R. 301). During these episodes, Plaintiff would isolate himself, not want to do anything, and spend most of his time in bed. Id. Dr. Gandotra noted that Plaintiff had poor concentration, anhedonia, and low energy levels. During the mental status exam, Dr. Gandotra noted that Plaintiff's affect had improved and that his major depressive disorder, recurrent, severe was in partial remission.[4] Id. Plaintiff's Lexapro was increased. (R. 302).

---

[4] Major depressive disorder in partial remission indicates that the symptoms of a major depressive episode are present but full criteria are not met, which is contrasted with major depressive disorder in full remission where no significant signs or symptoms of the disturbance

(continued...)

On April 9, 2005, Plaintiff had another follow-up appointment with Dr. Gandotra. (R.398).  At this visit, Plaintiff reported doing much better than before, but still experiencing "down times."(R. 398).  Plaintiff denied any overt signs of depression and denied suicidal or homicidal ideation. Id.   Upon mental examination, Dr. Gandotra noted that Plaintiff's mood was better and his affect congruent. Id.  He continued to indicate that Plaintiff's condition was in partial remission and Plaintiff was continued on Lexapro. Id.

On May 14, 2005, Dr. Gandotra composed a letter indicating that Plaintiff had been seen for a follow-up visit. (R. 108). Dr. Gandotra indicated that Plaintiff had been diagnosed with major depressive disorder and was being treated with Lexapro. (R. 108). He further indicated that Plaintiff was experiencing symptoms of depressed mood, anhedonia, isolation, tearfulness, poor self-esteem, and sleep and appetite disturbances. Id.  Dr. Gandotra reported that "[e]ven minor stress exacerbates these symptoms causing patient to isolate himself to a room all by himself for extended periods of time." Id.  Dr. Gandotra further noted that "[p]atient in spite of having shown intermittent periods with transient improvement of neurovegitative symptoms of depression, continues to have a severe debilitating pattern of depression affecting him biologically as well as psycho-socially." Id.

At his May 21, 2005 follow-up appointment with Dr. Gandotra, Plaintiff reported that he was not doing well physically and that this was affecting his mental health. (R. 396).  Plaintiff indicated that his mood was fluctuating from good to down, but that he had overall improvement especially with respect to suicidal ideation. Id. Dr. Gandotra indicated that Plaintiff was still experiencing periods of isolation, anergia, and anhedonia. Id. Upon mental examination, Dr. Gandotra noted that Plaintiff had fairly good eye contact and fair insight and judgment. Id. Dr. Gandotra continued Plaintiff on Lexapro and told him that he would have to switch psychiatrists as Dr. Gandotra was leaving People In Need. Id.

On July 8, 2005, Plaintiff had a follow-up appointment with Dr. Piccone for his heart

---

[4](...continued)
have occurred during the past two months.  See American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 349 (4th ed. 2000).

condition. (R. 313, 379).  Dr. Piccone noted that Plaintiff was somewhat fatigued and had occasional chest pain. Id. She further noted that Plaintiff had begun smoking a half a pack of cigarettes a day again. Id. Otherwise, Plaintiff's examination was normal. Id. Dr Piccone ordered testing and encouraged Plaintiff to stop smoking. Id.

On July 16, 2005, Plaintiff was seen by Dr. Daniel Monti, M.D. at People In Need. Plaintiff reported doing okay and having a stable mood since his last visit with Dr. Gandotra. (R. 312). Plaintiff discussed his stressors and indicated that they occasionally made him more depressed, hopeless, and helpless. Id. Dr. Monti indicated that Plaintiff was compliant with his medications, but was experiencing sleep difficulties and was not taking Vistaril because of dizziness. Id. Dr. Monti also indicated that Plaintiff had daytime somnolence on medication, manic symptoms of energy and no need for sleep, increased energy, anhedonia, and changes in his judgment. Id. Dr. Monti reported that Plaintiff had episodes of isolation, lack of energy, and anhedonia, but had improved substantially overall. Id. Upon mental examination Dr. Monti indicated that Plaintiff was in a good mood at the time, but might experience variations with social problems. He also indicated that he wanted to rule out mood disorder secondary to possible vascular encephalopathy associated with heart disease and rule out bipolar disorder, NOS. Id. Dr. Monti assessed Plaintiff with a Global Assessment of Functioning ("GAF") of 45 and switched his medication to Celexa for financial reasons. Id.

On August 8, 2005, Plaintiff was seen by Dr. Michael Frantz, M.D. of People in Need, who then became Plaintiff's treating psychologist. (R. 389). Plaintiff reported doing fairly well, but indicated that he was taking on tasks and not finishing them and had days of increased energy with poor sleep. Id.  He denied that these periods of increased energy lasted for weeks at a time. Plaintiff reported that his mood was better over the last month and mild anxiety was noted. Id. Dr. Frantz indicated that Plaintiff's mood was fair with congruent affect. He also indicated that Plaintiff's impulse control was fair. Dr. Frantz indicated that Plaintiff continued to suffer from major depressive disorder, recurrent, which was moderate at the time. Id.

Dr. Daniel Monti completed a worksheet on August 13, 2005 indicating that while Plaintiff was capable of understanding and carrying out simple directions, he was incapable of

8

remembering simple directions, not able to respond appropriately on a sustained basis to supervision, not able to respond appropriately on a sustained basis to co-workers, not able to respond appropriately on a sustained basis to the usual work situations, and not able to deal with changes to the routine work setting on a sustained basis. (R. 308). Dr. Monti also stated that "[s]tress from demands from working put him at risk for mood decompensation." Id.

On October 15, 2005, Dr. Frantz reported that Plaintiff was suffering from increased stress. (R. 308). Plaintiff had been compliant with his Celexa.  Dr. Frantz indicated Plaintiff had been experiencing anhedonia, decreased functioning, decreased sleep, feelings of hopelessness and helplessness, and had a mood ranked at a three out of ten. Id.  Dr. Frantz reported that Plaintiff's mood was down with congruent affect and that he was experiencing negative ruminating thoughts. Dr. Frantz also reported that Plaintiff had fair impulse control. (R. 497). Id. He noted that Plaintiff's major depressive disorder was recurrent, severe without psychosis. (R. 309).

On October 28, 2005, Plaintiff had a follow-up appointment with Dr. Piccone for his heart condition. (R. 375).  Dr. Piccone indicated that Plaintiff was doing well. She reported that an August 5, 2005 echocardiogram showed an inferior infarct and mild anteroseptal hypokinesis with no significant valvular dysfunction and that a stress test, performed by Dr. Paul Wawrzynski, M.D., demonstrated the same inferior infarct as well as a reversible mild defect in the apex. (R. 375-376). Plaintiff's examination was normal and he was instructed that he could stop taking his blood pressure medication because it was well-controlled.  (R. 375).

On November 19, 2005, Plaintiff was seen by Dr. Frantz for the treatment of "significant depression and anxiety." (R. 387).  Plaintiff reported that the increase in his Celexa was not helping his condition. Id. Dr. Frantz indicated that Plaintiff was experiencing significant anhedonia, feelings of hopelessness and helplessness, felt like a burden to his family, and was experiencing guilt. Id.  Plaintiff reported his mood as a two out of ten, that he had anxiety that affected his sleep, that he had current negative ruminating thoughts, and had passive death wishes but no plan or intent. Id. Dr. Frantz reported that Plaintiff had a low mood with blunted affect, was hyperverbal at times, and had fair impulse control. Id. Plaintiff's Prozac was

increased and Dr. Frantz discussed alternative treatment for depression including electro-convulsive therapy and newer adjunctive treatments such as vagal nerve stimulators. Id.

At a December 17, 2005 follow-up, Plaintiff reported that he had experienced no benefit from the medication since his last meeting with Dr. Frantz. (R. 386). Plaintiff indicated that he had several periods of decreased functioning and increased depression during which he became isolative, remained indoors, and had difficulty getting out of bed. Id. Dr. Frantz indicated Plaintiff was compliant with his medications, but was still experiencing anhedonia, feelings of hopelessness, helplessness, and stress from his family environment. Id. Upon examination, Dr. Frantz noted that Plaintiff's mood was low with blunted affect with some brightening. Id. Dr. Frantz suggested an increase in Plaintiff's therapy appointments. Id.

Dr. Frantz saw Plaintiff again on January 28, 2006. (R. 385).  Plaintiff reported increased agitation after starting Prozac which lasted for about a week and then subsided. Id. He further indicated that he had experienced no improvement in mood and was compliant with his therapist sessions. Id. Dr. Frantz indicated Plaintiff continued to be isolative with problems in social and occupational functioning, continued to be uncomfortable around others, and had frequent arguments and episodes of feeling tense. Id. Upon examination, Dr. Frantz indicated that Plaintiff continued to experience anhedonia, feelings of hopelessness and helplessness, and sleep disturbance, but was a low suicide risk at the time. Id.  Dr. Frantz further reported that Plaintiff had a low mood with blunted affect with some brightening. Id. He determined that Plaintiff's Prozac would be increased slowly. Id.

On March 11, 2006, Plaintiff reported to Dr. Frantz that he continued not to do well and that he believed he had felt better when on Celexa. (R. 384).  Dr. Frantz noted that "[m]edication management has not effectively improved symptoms over the past several months." Id. Upon examination, Dr. Frantz indicated that Plaintiff described his mood as bad and his affect was incongruent with his mood. Dr. Frantz recommended that Plaintiff increase his therapy sessions to several times a week and receive cognitive behavioral therapy. Plaintiff indicated that he was not interested in cognitive behavioral therapy. Id. Plaintiff was taken off of Prozac and placed back on Celexa and Wellbutrin was added. Id.

Plaintiff had another follow-up appointment with Dr. Frantz on June 10, 2006. (R. 382). Dr. Frantz noted that Plaintiff was being seen for "significant anxiety and depression." Plaintiff's multiple decompensations were discussed for a period of ten years prior. Id. Dr. Frantz opined that Plaintiff would likely continue to experience decompensations with his current psychiatric illness and that his treatment was aimed at limiting and decreasing those episodes. Id. He noted partial benefits from the medication including improvement in daytime functioning and energy with Celexa. Id. He also noted that Plaintiff experienced sexual side effects, mild tremor, and increased sedation as side effects. At that time, Dr. Frantz indicated that Plaintiff was experiencing potentially obsessive thoughts that would be monitored and likely require treatment similar to that of obsessive compulsive disorder treatment. Id. Upon examination, Dr. Frantz noted that Plaintiff's mood was fair and affect blunted and that he was tearful at times with some brightening. Id. Plaintiff's attention, concentration, and memory were fair and ruminating thoughts were noted. Plaintiff was continued on Celexa and Wellbutrin. Id.

In a letter dated, July 11, 2006, Dr. Wawrzynski, indicated plaintiff "has significant coronary artery disease [status-post] a bypass with preserved left ventricular function." (R.374). Plaintiff's ejection fraction was noted at fifty-one percent. Id.

On July 20, 2006, Plaintiff met with his therapist, Nick Rohall. (R. 404). Mr. Rohall indicated that Plaintiff had a mainly positive mood with normal content of speech that was consistent with his reported mood. Id.  He also indicated that Plaintiff's affect was full-range and non-labile. Id.

On July 22, 2006, Dr. Frantz completed a progress note for Plaintiff indicating that "PT continues with severe illness despite aggressive treatment." (R. 380-381).  Dr. Frantz indicated mild improvement with Wellbutrin but that the medication had to be stopped due to an allergic reaction. Id. Dr. Frantz also indicated Plaintiff was experiencing increased stress from medical, family, and environmental issues and that he would be unable to start or function at a level to start or maintain employment and had significantly impaired social functioning.  Id. Dr. Frantz noted that Plaintiff's treatment was likely effective to decrease suicidal thinking that would necessitate hospitalization in that his multiple medication trials and psychotherapy gave benefit.

11

Id. Upon examination, Dr. Frantz noted that Plaintiff's mood was depressed with congruent affect with decreased attention, memory, and concentration. Id. Plaintiff's Celexa was increased and he was started on Trazadone. Id.

On August 7, 2006, Plaintiff again met with his therapist, Mr. Rohall. (R. 403). Mr. Rohall indicated that Plaintiff had a positive mood and that his content of speech was consistent with that mood. Plaintiff's affect was full-range and non-labile. Id. On August 19, 2006, Plaintiff was seen by Dr. Frantz, who reported that Plaintiff was benefitting from his current treatment, but a continuing problem with functioning was noted. (R. 402).

On August 22, 2006, Mr. Rohall reported that Plaintiff continued to have an allergic reaction to Wellbutrin but that it was decreasing in severity. (R. 401). It was also noted that Plaintiff's speech was of normal rate, volume, and prosody, that the content of his speech was consistent with his reported mood, that his affect was full range and non-labile, and that his mood was euthymic. Id. On September 23, 2006, Mr. Rohall reported that Plaintiff had a subdued mood due to increased conflict with his wife and son and not feeling well physically. (R. 401). Plaintiff discussed ending his marriage. Mr. Rohall noted that Plaintiff's speech was of normal rate, volume, and prosody, that the content of his speech was consistent with his reported mood, that his affect was full range and non-labile, and that his mood was euthymic. Id.

On December 15, 2006, Plaintiff underwent a evaluative psychiatric examination with Dr. Kirk Lunnen. (R. 406-408). Dr. Lunnen noted that Plaintiff's mood was within normal limits and his affect congruent. Id. He further noted that Plaintiff did not appear overly anxious or nervous and had a sense of humor and was able to joke. (R. 408). Dr. Lunnen reported that Plaintiff had no noted memory problems, no impulse control problems, and was deemed credible. Id. Dr. Lunnen noted that his impression was that Plaintiff had Generalized Anxiety Disorder and Depressive Disorder, NOS. Id. He further noted that "Mr. Natale' long-term prognosis is largely dependent on his receiving appropriate psychiatric treatment for his significant anxiety problems." Id. Dr. Lunnen assessed Plaintiff with a GAF of 47 and opined that he could perform daily living activities with difficulty, and had some reported problems with social functioning and with concentration, persistence, or pace. Id.

12

On December 27, 2006, Plaintiff underwent a consultative examination with Dr. Hany Rezk, M.D. (R. 412-414). Plaintiff's physical examination was normal. (R. 413). Dr. Rezk noted that his impression was that Plaintiff suffered from anxiety and depression, coronary artery disease status CABG, hypertension, hypercholesterolemia, and a history of diverticular disease. Id. In a medical assessment of Plaintiff's ability to do work-related activities, Dr. Rezk opined that Plaintiff could lift, at maximum, twenty pounds occasionally; could lift five pounds frequently; could stand for three to four hours a day total and without interruption one to two hours a day; could walk one hour a day and without interruption for thirty minutes; could sit for an unlimited amount of time during the work-day; could climb occasionally; could kneel, stoop, balance, crouch, and crawl frequently; and had no seeing, speaking, handling, feeling, reaching, hearing, pushing/pulling, or environmental limitations. (R. 415-417).

Dr. Lunnen completed a Medical Source Statement of Ability to Perform Activities on December 29, 2006. (R. 410). Dr. Lunnen opined that Plaintiff had slight limitations in the ability to understand, remember, and carry-out short simple instructions; moderate limitations in the ability to remember and understand detailed instructions; and marked limitations in carrying out detailed instructions. Dr. Lunnen based these findings on "significant present anxiety and history of at least two specific work-related episodes of decompensation." Id. Dr. Lunnen also opined that Plaintiff had moderate restrictions in interacting with the public, supervisors, and co-workers; marked restrictions in the ability to respond appropriately to pressures in the usual work setting; and moderate limitations in the ability to respond to changes in the routine work setting. Id. Dr. Lunnen based these findings on "significant present affective difficulties & past employment related problems." Id.

On April 6, 2007, plaintiff completed a daily activities questionnaire indicating that he could do dishes, laundry, cleaning, and take care of his personal needs, except during periods of decompensation. (R. 196-198). He also indicated that he would accompany his wife to the store occasionally, would read the bible, and sometimes would go out to dinner with his wife. (R. 198). He reported that his wife would pay the bills because he could not keep track of them, pay them on time, or organize them. He indicated that he never visited family members and that his

sleep was erratic. Id.

At the supplemental hearing on April 12, 2007, Plaintiff testified that he had worked in food service and sales from 1987-1996, had worked as an apartment maintenance man from 2002-2003, had worked as a UPS driver from 2003-2004, and as a welder for one month in 2004. (R. 510). He also testified he saw his psychologist once every four to six weeks and that his Celexa "helps me. It, it seems to have lessened the severity somewhat, but I still–it–I'm better taking it than when I'm not taking it at all.". (R. 512, 519). He noted that Dr. Frantz had discussed electro-shock therapy with him. (R. 520). Plaintiff testified that he could clean the house, do dishes, do laundry, and drive his wife to the store and take the food from the car to the house. He testified that he went to church weekly, watched TV and sometimes remembered what he watched, read the Bible and books about religious history and sometimes remembered what he was reading, and sometimes played with his dog outside. (R. 523-524). He also testified that he had no problems sitting and no problems walking. (R. 524). With respect to his depression, Plaintiff testified that he began experiencing significant depression symptoms when he was working as a welder and became light-headed and sick. (R. 526). He became slow, lethargic, tired, had negative and bad thoughts, and thoughts of suicide due to the depression. (R. 527-528). He also testified that he experienced three to four episodes of decompensation lasting three to four days in 2007 and two other episodes that lasted about two days. (R. 528). He also reported loss of appetite, sleep disturbance, effects on his social functioning, and problems with his ability to concentrate. (R. 530).

On April 14, 2007, Dr. Frantz wrote a letter indicating that Plaintiff was being treated for major depression, recurrent severe that had started ten years prior. (R. 424). Dr. Frantz indicated that Plaintiff suffered from frequent episodes of decompensation and significant reduction in daily functioning. He noted that the episodes of decompensation occurred three to four times a year and lasted one to three months at a time. Id. Dr. Frantz further noted that Plaintiff experienced areas of decreased functioning including cognitive functioning and the inability to perform at a level to sustain employment. As evidence, he cited Plaintiff's severe depression and significant concerns for Plaintiff's safety in that the depression could lead to the return of suicidal

thoughts or life-threatening symptoms. Id. He noted that Plaintiff reported symptoms of anhedonia/loss of interest in most activities, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulties in concentration, suicidal ideations, and episodes of decompensation. (R. 425). With respect to the episodes of decompensation, Dr. Frantz noted that Plaintiff experienced them frequently and that he could not function at any level when an episode happened and opined that they would continue to happen and be of extended duration. Id. He further opined that Plaintiff had difficulties in maintaining concentration, persistence, and pace which would prevent concentrating on work-related duties for a majority of the standard work-day, would prevent Plaintiff from performing work-related duties on a consistent basis or at a consistent pace, and would cause numerous absences throughout the workweek or month. He also opined that Plaintiff had marked limitations in the activities of daily living and in maintaining social functioning. (R. 425-426).

In his opinion, the ALJ concluded that Plaintiff had not been under a disability as defined in the Act from February 15, 2004, through the date of the decision.  (R. 33).  The ALJ determined that Plaintiff had the following medically determinable "severe" impairments: depression and coronary artery disease. (R. 26).  He also determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 including Section 12.04, pertaining to affective disorders, or 4.04, pertaining to coronary artery disease.  (R. 26-27). He further determined that Plaintiff had the residual functional capacity to engage in light work not requiring rapid movements and constant use of the hands; lifting no more than twenty pound occasionally and ten pounds frequently; not requiring exposure to fumes, dust, gases, odors, damp or wet humidity, or heat; requiring the understanding and carrying out of no more than simple job instructions; not requiring working in close proximity to coworkers, decision-making, competitive production rate pace, intensive supervision, or working in areas with poor ventilation. (R. 27-31).

In support of his determination that Plaintiff did not meet a Listing, the ALJ stated that "while the claimant has shown 'A' criteria requirements for depression as set forth in 12.04, he

15

has experienced only mild restrictions of activities of daily living, and no more than moderate difficulties in maintaining social functioning and maintaining concentration, persistence or pace." (R. 27).  The ALJ further stated that "there is no evidence of any episodes of decompensation of extended duration, or a severe mental impairment lasting for two or more years with signs and symptoms continuing despite medication or psychosocial support...." Id.

In support of his conclusion that Plaintiff could perform modified light work, the ALJ considered Plaintiff's heart related medical records, psychological treatment records, evaluations, and testimony. (R. 27-31). In making his determination, the ALJ did not give controlling weight to the statements of Dr. Gandotra, Dr. Monti, or Dr. Frantz. (R. 30, 31). He also found that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence, and limiting effects of those symptoms are not entirely credible." (R. 28).

In discounting the reports of Plaintiff's three treating psychologists, the ALJ cited to Plaintiff's therapy record of August 2004 assessing Plaintiff as having a GAF of 60. (R. 29).  The ALJ also relied on treatment notes of Plaintiff's mental status exams and discussed Plaintiff's ailment being "situational in nature [and] intermittent." Id. The ALJ further relied on Dr. Lunnen's evaluative examination and Plaintiff's testimony. (R. 30). In rejecting Dr. Franz' opinion, the ALJ found that the form utilized was a "check box form" and therefore not entitled to controlling weight since it contained "no explanation or supporting rationale." (R. 31).

IV.    STANDARDS OF REVIEW

The Commissioner's findings and conclusions leading to a determination that a claimant is not "disabled" must be supported by substantial evidence.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Stunkard v. Secretary of Health and Human Services, 841 F.2d 57, 59 (3d Cir. 1988).  The task of this court in reviewing the decision below is "to determine whether there is substantial evidence on the record to support the ALJ's decision."  Burnett v. Commissioner of Social Security, 220 F.3d 112, 118 (3d Cir. 2000).  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Morales v.

Aphel, 225 F.3d 310, 316 (3d Cir. 2000)(quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)).

As the fact finder, the administrative law judge ("ALJ") has an obligation to weight all the facts and evidence of record and may accept or reject any evidence if the ALJ explains the reasons for doing so. Plummer, 186 F.3d at 429. This includes crediting or discounting a claimant's complaints of pain and/or subjective description of the limitations caused by his or her impairments. Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983); Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999). And where the findings of fact leading to the decision of the Commissioner are supported by substantial evidence, a reviewing court is bound by those findings, even if it would have decided the inquiry differently. Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2000). But where a review of the entire record reveals that the Commissioner's decision is not supported by substantial evidence, the court has an obligation to reverse the decision and remand with direction to grant benefits or conduct further proceedings. Podedworny v. Harris, 745 F.2d 210, 221 (3d Cir. 1984). A remand with direction to grant benefits is appropriate only when substantial evidence on the record as a whole indicates the claimant is disabled and entitled to benefits. Id. at 221-22.

IV.   DISCUSSION

Plaintiff argues that the ALJ did not give appropriate weight to the opinions of Dr. Gandotra, Dr. Monti, and Dr. Frantz. In addition, Plaintiff asserts that the ALJ erred in finding that Plaintiff's depression and anxiety did not meet the requirements of Listing 12.04. Finally, in a related argument, Plaintiff argues that the ALJ erred in determining that Plaintiff was capable of performing modified light work in light of his significant depression and anxiety. The Defendant posits that the ALJ's determination was supported by substantial evidence.

The ALJ failed to accord proper weight to the opinions and assessments of the treating psychologists. "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d

17

422, 429 (3d Cir. 1999)); see also Allen v. Bowen, 881 F.2d 37, 41 (3d Cir. 1989); Podedworney

v. Harris, 745 F.2d 210, 217-18 (3d Cir. 1984). Therefore, a treating physician's opinion is

accorded controlling weight if it is "well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not consistent with other substantial evidence in [the

claimant's] record." Fargnoli v. Massarani, 247 F.3d 34, 42 (3d Cir. 2001).

Dr. Gandotra  made unequivocally clear in his opinion that Plaintiff was unable to meet

the physical demands of an eight hour work day.  The ALJ rejected all of Dr. Gandotra's mental

capacity assessments from his report of December, 4, 2004.  In that report Dr. Gandotra noted

that Plaintiff was suffering from major depressive disorder, recurrent severe and cited Plaintiff's

symptoms of anhedonia, sleep disturbance, decreased energy, feelings of guilt or worthlessness,

difficulty concentrating and thoughts of suicide as support for this diagnosis. (R. 297). Based on

his assessment of Plaintiff's condition, Dr. Gandotra determined that Plaintiff could not meet the

mental requirements necessary to complete an eight hour day.[5]

In a letter dated May 14, 2005, Dr. Gandotra further explained that Plaintiff was

experiencing symptoms of depressed mood, anhedonia, isolation, tearfulness, poor self-esteem,

and sleep and appetite disturbances and that "[e]ven minor stress exacerbates these symptoms

causing patient to isolate himself to a room all by himself for extended periods of time." (R.

108).  Furthermore, Dr. Gandotra noted that the "[p]atient in spite of having shown intermittent

periods with transient improvement of neurovegetative symptoms of depression, continues to

have a severe debilitating pattern of depression affecting him biologically as well as psycho-

socially."Id.   These of course are well documented observations that were noted repeatedly

_____

[5] Specifically, Dr. Gandotra opined that Plaintiff was suffering from extreme restrictions
in the activities of daily living, marked restrictions in the maintaining of social functioning,
marked deficiencies in concentration, persistence, or pace, and four or more episodes of
decompensation.  (R. 298). Dr. Gandotra further noted that there were repeated periods of
decompensation present, each of extended duration, and that the residual disease process had
resulted in such a marginal adjustment that even a minimal increase in mental demands or change
in the environment would be predicted to cause Plaintiff to decompensate.  (R. 299). These
limitations reflect a residual functional capacity that would not meet the requirements of
substantial gainful activity.

through Plaintiff's psychological treatment records.

The ALJ similarly rejected the opinions of Dr. Monti who took over Plaintiff's treatment for a time after Dr. Gandotra left People in Need.  Dr. Monti very clearly opined that "[s]tress from demands from working put [Natale] at risk for mood decompensation." (R. 308).  The remainder of the form dated August 13, 2005 indicated that while Plaintiff was capable of understanding and carrying out simple directions, he was incapable of remembering simple directions, not able to respond appropriately on a sustained basis to supervision, not able to respond appropriately on a sustained basis to co-workers, not able to respond appropriately on a sustained basis to the usual work situations, and not able to deal with changes to the routine work setting on a sustained basis. Id.

Finally, there was the letter, considered and rejected by the ALJ, penned by Plaintiff's third People in Need psychologist, Dr. Frantz, and dated April 14, 2007 after nearly two years of treatment. Dr. Frantz undeniably opined that Plaintiff was unable to perform at a level to sustain employment. (R. 424). As support for this assessment Dr. Frantz cited Plaintiff's frequent episodes of decompensation and significant reduction in daily functioning, occurring three to four times a year and lasted one to three months at a time. Id. With respect to the episodes of decompensation, Dr. Frantz noted that Plaintiff experienced them frequently and that he could not function at any level when an episode happened and opined that they would continue to happen and be of extended duration. (R. 425). He additionally cited to Plaintiff's symptoms of anhedonia/loss of interest in most activities, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulties in concentration, suicidal ideations, and episodes of decompensation. Id. Based on this assessment, Dr. Frantz opined that Plaintiff's mental limitations would preclude his working for an eight hour workday.[6]

---

[6] Specifically, Dr. Frantz opined that Plaintiff had difficulties in maintaining concentration, persistence, and pace which would prevent concentrating on work-related duties for a majority of the standard work-day, would prevent Plaintiff from performing work-related duties on a consistent basis or at a consistent pace, and would cause numerous absences throughout the workweek or month. He also opined that Plaintiff had marked limitations in the

(continued...)

As stated above, the ALJ gave virtually no weight to the assessments of Plaintiff's treating psychologists on the grounds of Plaintiff's first assessment at People in Need resulted in him being assessed with a GAF of 60, a few mental status examinations, the consultative examiner report of Dr. Lunnen, the fact that Dr. Franz' opinion was in the form of an unsupported check-box form, Plaintiff's report to Dr. Gandotra regarding his inability to pay for anti-depressant medications, Plaintiff's appearance and demeanor at the hearing, and Plaintiff's daily activities.  Of course, several of these sources fail to provide competent contrary medical evidence and thus the remaining medical grounds would necessarily need to constitute substantial evidence in support of the ALJ's rejection of treating physicians' opinions for that rejection to be proper, which they do not.  See  Plummer,186 F.3d at 429 ("An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided.") (citing Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir.1985); accord Brownawell v. Commissioner Of Social Security, 554 F.3d 352, 355 (3d Cir. 2008) (same).

A close consideration of each ground advanced by the ALJ for substantially discounting the three psychologists' opinions and assessments demonstrates the speculative nature of the ALJ's reasoning.  The ALJ's reasoning that Plaintiff's initial therapy evaluation had bearing on the weight to be given to Dr. Gandotra's opinion was unsupported.  While the GAF assessment was assessed at a score of 60, indicating moderate symptoms, Plaintiff had not yet undergone an evaluation by a licensed psychiatrist or psychologist for a determination of his mental impairments. The form completed by the therapist was a diagnostic evaluation aimed at determining Plaintiff's next treatment step. (R. 303-306). In the form it is noted that Plaintiff would need to undergo psychiatric evaluation. Id.  His first psychiatric evaluation, performed by

---

[6](...continued)

activities of daily living and in maintaining social functioning. (R. 425-426). These limitations reflect a residual functional capacity that would not meet the requirements of substantial gainful activity.

Dr. Gondotra, took place on September 11, 2004 (R. 308-309). Dr. Gandotra's examination of Plaintiff revealed that Plaintiff was having difficulty sleeping, some mood swings, racing thoughts, anxiety, trouble focusing, was "being edgy," and was anhedonic and anergic. (R. 308). Dr. Gandotra noted Plaintiff's suicidal thoughts that had been occurring for the past several months, and went so far as to elicit a promise from Plaintiff that he would pass any guns he had in his home on to his cousin. Dr. Gandotra diagnosed Plaintiff with major depressive disorder, recurrent, severe without psychosis[7] and began treating him with Lexapro and Trazadone. Id.   It is clear that Plaintiff received no diagnosis or treatment until he underwent evaluation by Dr. Gandotra.  Therefore, the intake GAF score was not based on any thorough examination or assessment of Plaintiff's mental limitations and can hardly overcome the import of Plaintiff's later diagnosis and prescribed treatment and. Additionally, this GAF was assessed well before Dr. Gandotra assessed Plaintiff's restrictions and limitations in December 2004. Therefore, it was not a proper grounds for discounting Dr. Gandotra's opinion.

The ALJ also specifically relied on three mental status examinations, two performed by Dr. Gandotra in September 2004 and February 2005, and one performed by Dr. Monti in July 2005. Furthermore, he generally discounted Dr. Frantz's opinion stating that "Dr. Frantz's own treatment records which confirm mood and affect abnormalities on mental status examination" were undermined by the fact that Plaintiff was alert and oriented at several unspecified mental status examinations. Review of these records reveal that the ALJ misconstrued the findings in these records and picked specific passages to suit his argument. At Dr. Gandotra's September 2004 examination of Plaintiff the notes that were taken clearly indicate Plaintiff's serious symptoms, including suicidal thoughts. The examination revealed a depressed mood and congruent affect, which resulted in a diagnosis of major depressive disorder, *recurrent*, *severe*. (R. 308-309). Dr. Gandotra's findings do not indicate "generally negative findings on mental status examination" as stated by the ALJ. (R. 29)  The fact that Plaintiff was cooperative and

---

[7] It is again noted that this diagnosis indicates that Plaintiff would experience periods of remission of some symptoms.

fully oriented upon examination did not change Dr. Gandotra's diagnosis that Plaintiff's depressive disorder was both *recurrent* and *severe.* The ALJ also asserted that Plaintiff's February 2005 mental examination indicated that Plaintiff's depression "was situational in nature, intermittent, and generally occurred when he thought about his 'current situation as well as financial issues.'" (R. 29). When reviewing the record, it reveals that Plaintiff continued to experience depression stints lasting four days or more when thinking about his financial situations and that these episodes would result in Plaintiff isolating himself, not wanting to do anything, and spending most of his time in bed. (R. 297-298). As was noted before, the nature of Plaintiff's diagnosis indicated some episodes of lessened symptoms or normal functioning, but did not discount the severity of Plaintiff's illness. This record reveals strong evidence that thoughts of his current financial situation tended to cause Plaintiff periods of decompensation, but in no way indicates that this fact  rendered the severity of his disorder "intermittent" or "situational." Dr. Gandotra noted that Plaintiff had recurrent symptoms of anhedonia, low energy levels, and poor concentration that were hardly "intermittent" or "situational."

The final specific record upon which the ALJ relies, that of Dr. Monti from July 2005, was similarly misconstrued. The ALJ stated that the record revealed "generally negative findings on mental status exam" and that Dr. Monti found that Plaintiff's mood was "good" and affect was "bright."(R. 30).  In fact, Dr. Monti indicated that Plaintiff's mood was good, but noted that he "might experience variations with social problems." He also assessed Plaintiff with a GAF of 45, indicative of serious symptoms, which the ALJ failed to address in his opinion.

The remainder of Plaintiff's medical records support the treating psychologists' opinions that Plaintiff was incapable of sustained work. From the beginning of his treatment, Plaintiff's psychologists routinely noted that he was suffering from difficulty sleeping, mood swings, anxiety, trouble focusing, and was anhedonic and anergic. (R. 309). Periods of decompensation and isolation were also repeatedly noted. (R. 301). In July 2005, Dr. Monti noted that Plaintiff was experiencing sleep difficulties, daytime somnolence on medication, manic symptoms of increased energy and no need for sleep, anhedonia, and changes in judgment. Dr. Monti also noted episodes of isolation, lack of energy, and anhedonia. (R. 312). Similar symptoms were

noted in October 2005 by Dr. Frantz as anhedonia, decreased functioning, decreased sleep, and feelings of hopelessness and helplessness. Plaintiff's mood was reported as down and he was having negative ruminating thoughts. (R. 308). In November 2005, Dr. Frantz noted "significant depression and anxiety" with significant anhedonia, feelings of hopelessness and helplessness, negative ruminating thoughts, passive death wishes,  feelings by Plaintiff of being a burden to his family, and guilt. Dr. Frantz noted low mood with blunted affect and hyperverbalness. Plaintiff's medications were increased. (R. 387). Dr. Frantz even went so far as to discuss electroconvulsive ("ECT") and vagal nerve stimulator therapy with Plaintiff, which are generally only considered if standard treatment options fail. [8]

In December 2005, Plaintiff reported no benefit from his medication with several periods of decreased functioning and increased depression when he was isolative, remained indoors, and had difficulty getting out of bed. Dr. Frantz stated that despite compliance with medication, Plaintiff was still experiencing anhedonia, feelings of hopelessness, helplessness, and stress from his family environment. (R. 386). Dr. Frantz suggested an increase in therapy appointment, however, notes from January 2006 indicate that despite compliance with therapy sessions, there was no improvement in mood. (R. 385). Plaintiff continued to be isolative with problems with social and occupational functioning, continued to be uncomfortable around others, and had frequent arguments and episodes of feeling tense. Id. Plaintiff's situations was much the same in March 2006, when Dr. Frantz noted that "[m]edication management has not effectively improved symptoms over the past several months." Dr. Frantz changed Plaintiff's medication back to Celexa. (R. 384). "Significant anxiety and depression" were noted again in June 2006 and Dr. Frantz opined that Plaintiff would likely continue to experience decompensations with his current

_____

[8] "The most common use of ECT is in patients who have not responded to other treatments. During the course of pharmacotherapy, lack of clinical response, intolerance of side effects, deterioration in the psychiatric condition, the appearance of suicidality or inanition are reasons to consider the use of ETC."  APA Task Force Report on Electroconvulsive Therapy, http://www.ect.org/apa-task-force-report-on-electroconvulsive-therapy/ (last visited July 16, 2009).

psychiatric illness and that his treatment would be aimed at limiting and decreasing those episodes. (R. 382). A progress noted from July 2006 indicated that "PT continues with severe illness despite aggressive treatment." (R. 380). Mild improvement was noted with Wellbutrin but that had to be stopped due to an allergic reaction. Dr. Frantz made several serious findings on this date including that Plaintiff was experiencing increased stress and that he would be unable to start or function at a level to start or maintain employment and had significantly impaired social functioning. Id. Continuing problems with functioning were noted August as well. (R. 206). Although there was some mild improvement indicated in early 2005, this improvement was temporary in nature and not unexpected due to Plaintiff's diagnosis and Dr. Gandotra's opinion that "[p]atient in spite of having shown intermittent periods of transient improvement of neurovegetative symptoms of depression, continues to have a severe debilitating pattern of depression affecting him biologically as well as psycho-socially." (R. 108). Overall, Plaintiff's medical records do not suggest an ability, on behalf of Plaintiff, to complete sustained work as there is significant evidence that his condition was lasting, serious, and debilitating.

Against this backdrop it was error to reason that a few excerpts from Plaintiff's medical records can constitute substantial evidence to overcome the breadth of medical evidence supporting the psychologists' findings, assessments and opinions. It is simply too well settled that an ALJ is not free to rely on a few isolated and selective excerpts from the medical evidence to inform his assessment of a plaintiff's residual functional capacity. See Kent, 710 F.2d at 114 (A single piece of evidence is not substantial where it is overwhelmed by other evidence or if it is not evidence but mere conclusion.); Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981) ("Substantial evidence can be considered as supporting evidence only in relationship to all the other evidence in the record."). The ALJ's efforts to extrapolate from a few mental status examinations a basis for discounting the specific assessments made by Plaintiff's long term psychologists lacks logical appeal. And given the corroborating medical information contained in the treating records of Plaintiff's psychologists, it is clear that the ALJ's rejection of Dr. Gandotra, Dr. Monti, and Dr. Frantz's, assessments and opinions on the basis of a few treatment notes and a GAF score taken out of context cannot stand.

24

The final piece of medical evidence relied upon by the ALJ was the consultative exam and resulting report of Dr. Lunnen. The ALJ relied heavily on Dr. Lunnen's assessment that Plaintiff had slight limitations in the ability to understand, remember, and carry-out short simple instructions, moderate limitations in the ability to remember and understand detailed instructions, moderate restrictions in interacting with the public, supervisors, and co-workers, and moderate limitations in the ability to respond to changes in the routine work setting. As to Dr. Lunnen's opinion that Plaintiff suffered marked difficulty in working under pressure, the ALJ stated that this finding was "based on the claimant's subjective complaints and self-reported history." The ALJ failed to address Dr. Lunnen's finding that Plaintiff had marked limitations in the ability to respond appropriately to pressures in the usual work setting. (R. 410).

Despite the ALJ's statement that these opinions were based on Plaintiff's "self-reported history," the report itself makes clear that the opinion about Plaintiff's marked limitations with regard to working under pressure was based on both "*significant present anxiety* and history of at least two specific work-related episodes of decompensation." (R. 410). (emphasis added.) Plaintiff's marked limitations in the ability to respond to pressures in the usual work setting, were noted to be based on "*significant present affective difficulties* & past employment related problems." Id. (emphasis added). As is evident, the ALJ was selective in giving weight to certain of Dr. Lunnen's opinions while ignoring others. At the examination itself, Dr. Lunnen noted that "Mr. Natale' long-term prognosis is largely dependent on his receiving appropriate psychiatric treatment for his significant anxiety problems." (R. 408). Plaintiff was also assessed with a GAF of 47, indicative of serious symptoms. Id. Neither of these two facts was mentioned or explained by the ALJ in the context his assessment of Dr. Lunnen's report and are generally consistent with the examinations and observations of Plaintiff's treating psychologists. Indeed, Dr. Lunnen's report and examination did not discount the serious and significant nature of Plaintiff's ailments. It is also significant to note that while Dr. Lunnen examined Plaintiff on one occasion, he did not treat him on an extended basis. The examination was merely a "consultation." While the opinions of examining physicians are generally given more weight than the opinions of physicians who have merely reviewed the record, "the opinion of an examining physician who saw the claimant

only once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion." <u>Doyal v. Barnhart</u>, 331 F.3d 758, 763 (10th Cir. 2003) citing <u>Reid v. Chater</u>, 71 F.3d 372, 374 (10th Cir. 1995). Therefore, it was improper for the ALJ to hand-pick portions of Dr. Lunnen's examination and report to contradict the multiple opinions of Plaintiff's treating psychologists.

Plaintiff's activities of daily living likewise did not warrant the ALJ's rejection of the overwhelming and solidly supported psychological evidence establishing Plaintiff's disability. The ALJ surmised that Plaintiff's daily activities constituted a "wide range of daily activities consistent with the ability to perform light work" and supported the dismissal of the treating physicians' findings.  The ALJ noted that Plaintiff is able to care for "personal needs such as bathing and dressing, and helping with the household chores such as laundry." (R. 30). Plaintiff can also drive, watch TV, help his wife with shopping, attend church, and read.. In addition, the ALJ was critical of Plaintiff's reading "bel[ying] the claimant's allegations as to difficulties with concentration."

While Plaintiff freely admitted he could perform many household chores, such activity in itself does not supply the grounds for dismissing the treating psychologists' opinions.  It is well-settled that "disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity."  <u>Wright v. Sullivan</u>, 900 F.2d 675, 682 (3d Cir. 1990) (quoting <u>Smith v. Califano</u>, 637 F.2d 968, 971 (3d Cir. 1981)).  To the contrary, the ability to engage in "sporadic or transitory activity does not disprove disability" and may well indicate merely that the claimant is only partially functional on a periodic basis.  <u>Id</u>.  Here, when the record is closely reviewed as a whole, an inference of partial functionality, when not in an episode of decompensation, is all that can be drawn from plaintiff's efforts to remain independent and engage in social events such as church. Furthermore, it was improper for the ALJ to put significant weight on Plaintiff's testimony that he read and therefore, was not having difficulties with concentration when in fact, Plaintiff actually testified that he read, but only sometimes remembered what he was reading. (R. 523-524).

The ALJ also erred in using his observations from the hearing to assert that Plaintiff had

no "problems with concentration, memory, or meeting any other basic mental demands of work" and in his reliance on  Plaintiff's discussion with Dr. Gandotra about being unable to afford psychological medication. Although the ALJ is not prohibited from considering the claimant's appearance and demeanor at a hearing, the ALJ may not "impose his observations in lieu of a consideration of the medical evidence presented." Norris v. Heckler, 760 F.3d 1154, 1157 (11th Cir. 1995). *See* Morales v. Apfel, 225 F.3d 310, 317-318 (3d Cir. 2000) citing Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999) ("an ALJ may not make 'speculative inferences from medical reports' and may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion."). It was obviously improper for the ALJ to make the determination that Plaintiff had no problems with concentration, memory or other basic work demands based on his observations at the hearing. With respect to Plaintiff's statement regarding the ability to pay, the ALJ stated that the assertion that Plaintiff could not afford medications was "not credible since the claimant would have qualified for assistance with payment for his medications as a recipient of Public Assistance." (R. 29). There is no evidence of record that Plaintiff was qualified for assistance with his medicines or knew that he could qualify when he began seeing Dr. Gandotra. In fact, at his April 9, 2005 visit, Dr. Gandotra noted that he had "filed for an indigent program for Plaintiff status of which is pending." (R. 398). Despite having difficulty with paying for his medications, Plaintiff was compliant with first his Lexapro and then his Celexa, which he obtained through samples and what he was able to pay for. (R. 309, 312). This in no way weighs on the severity of Plaintiff's ailments and it is noted that Plaintiff had been taking anti-depressants for several months when Dr. Gandotra rendered his first opinion in December and for nine months by the time of his May 2005 letter. Therefore, the ALJ could not use this statements as evidence that the severity of Plaintiff's ailment was caused by a "decision" on his part not to take medication before beginning treatment. The ALJ's statement was obviously a credibility judgment and was improper evidence to use to contradict Plaintiff's treating physicians.

Finally, the ALJ improperly asserted that Dr. Frantz's opinion was an unsupported check-box form that was not entitled to great weight. Dr. Frantz completed a form in which boxes were

checked indicating Plaintiff's limitations, however, in support of that form, Dr. Frantz attached a letter stating that Plaintiff was experiencing frequent episodes of decompensation coupled with significant reduction in daily functioning. (R. 424). He further noted problems with cognitive functioning and concerns for safety with the potential return of suicidal thoughts and life-threatening symptoms. Id. Form reports are generally "weak evidence at best" unless they are accompanied by support and medical records. *Mason v. Shalala,* 994 F.3d 1058, 1065 (3d Cir. 1993). See also Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986). In this case, Dr. Frantz's report was supported not only by his accompanying letter, but also by his medical records as discussed in great detail above. It was improper for the ALJ to reject Dr. Frantz's opinion solely on the basis that part of his opinion consisted of a check-box form.

In light of the ALJ's obvious error in disregarding the opinions and evaluations of all three of Plaintiff's treating psychologists and the significant and substantial evidence of Plaintiff's treatment history and medical records indicating that Plaintiff was disabled,  the ALJ was wrong in determining that Plaintiff did not meet Listing 12.04 and erred in his assessment of Plaintiff's residual functional capacity. Listing 12.04 consists of paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations) and paragraph C criteria (a set of additional functional limitations). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00 (A).  The required level of severity for 12.04 affective disorders is met when "the requirements in both A and B are satisfied." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04. The paragraph B requirements of Listing 12.04 require at least two of the following:

> 1. Marked restriction of activities of daily living; or
>
> 2. Marked difficulties in maintaining social functioning; or
>
> 3. Marked difficulties in maintaining concentration, persistence or pace; or
>
> 4. Repeated episodes of decompensation, each of extended duration[.]

20 C.F.R. Pt. 404, Subpt. P. App. 1 § 12.04(B). The term "marked" means "more than moderate but less than extreme," and a "marked limitation" is one that seriously interferes with the claimant's ability to "function independently, appropriately, effectively, and on a sustained

basis." 20 C.F.R. Pt. 404, Subpt. P, Appx. 1 § 12.00C.

Dr. Gandotra clearly opined that Plaintiff had either "marked" or "extreme" limitations in each of the first three categories and multiple episodes of decompensation. (R.297-299). Dr. Monti opined that plaintiff was incapable of remembering simple directions, not able to respond appropriately on a sustained basis to supervision, not able to respond on a sustained basis to co-workers, not able to respond appropriately to the usual work situations and not able to deal with changes to the routine work setting on a sustained basis. (R. 308). Dr. Frantz's letter and accompanying form indicate that Plaintiff suffered from frequent episodes of decompensation lasting one to three months at a time, experienced areas of decreased functioning, and lacked the ability to perform at a level to sustain employment. He further opined that Plaintiff had difficulties in maintaining concentration, persistence, and pace, which would prevent concentrating on work-related duties for a majority of the standard work-day, would prevent Plaintiff from performing work-related duties on a consistent basis or at a consistent pace, and would cause numerous absences throughout the work week or month (R. 424-426). He also specifically noted marked limitations in the activities of daily activity and in maintaining social functioning. Id. Plaintiff clearly meets the necessary categories in the "B" criteria and as the ALJ noted "claimant has shown 'A' criteria requirements for depression as set forth in 12.04." Therefore, Plaintiff meets Listing 12.04 and lacks a residual functional capacity necessary to complete sustained work on any level.

The Act describes disability as the inability to engage in substantial gainful activity by reason of a physical or mental impairment that can be expected to last for a continuous period of at least twelve months.  The ability to engage in substantial gainful employment means more than the ability to do certain of the physical and mental acts required on the job; the claimant must be able to sustain the physical and mental demands of work-related activities throughout continuous attendance in a regular work week.  Dobrowolsky v. Califano, 606 F.2d 403, 408 (3d Cir. 1979). The question thus is not whether a claimant can perform activities consistent with substantial gainful activity on any particular day, but whether the claimant has the ability to engage in work activities on a systematic and sustained basis.  Plaintiff had the burden of making out a prima

29

facia case that he was disabled within in the meaning of the Act.  <u>Parker v. Harris</u>, 626 F.2d 225, 231 (2d Cir. 1980); <u>Livingston v. Califano</u>, 614 F.2d 342, 345 (3d Cir. 1980); 20 C.F.R. § 404.1512(a).  This burden generally is met where the record clearly substantiates a claimant's subjective claim that he or she has an impairment which prevents the claimant from engaging in substantial gainful activity.  <u>Rossi v. Califano</u>, 602 F.2d 55 (3d Cir. 1979).  Here, the substantial evidence of record supports only the conclusion that plaintiff could not engage in such activity at least as of December 4, 2004, when Dr. Gandotra indicated that the limitations from Plaintiff's impairments prevented him from meeting the demands of substantial gainful activity on a regular and sustained basis.  Accordingly, to the extent the ALJ's findings and conclusions reflected a determination that Plaintiff was not disabled at or after that point in time they were not supported by substantial evidence.  As a result, Plaintiff's motion for summary judgment must be granted and the matter will be remanded to the Commissioner with direction to grant benefits consistent with the recognition that Plaintiff was disabled on or before December 4, 2004.

An appropriate order will follow.


<u>Date: August 21, 2009</u>




<u>s/ David Stewart Cercone</u>
David Stewart Cercone
United States District Judge


cc:     Joshua Lamancusa, Esquire
        414 North Jefferson Street
        New Castle, PA 16101

        Christy Wiegand
        Assistant United States Attorney